(No. 15185.—Judgment affirmed.)

*In re* Estate of James C. King, Deceased.—(MARY C. MEL-
VIN, Plaintiff in Error, *vs.* THE NORTHERN TRUST COM-
PANY, Trustee, *et al.* Defendants in Error.)

*Opinion filed October 20, 1923—Rehearing denied Dec. 5, 1923.*

WILLS—*what must be shown before probate can be set aside
and a later will be probated.* Before the probate of a will can be
set aside by a party to the probate proceeding upon the ground
that a later will has been discovered, the petitioner must show that
the probate of the earlier will was procured by fraud or mistake
and that the later will was duly executed; and this rule applies,
after the death of such party, to one who is a devisee under her
will.

WRIT OF ERROR to the Circuit Court of Cook county;
the Hon. JESSE A. BALDWIN, Judge, presiding.

ROY D. KEEHN, (EDWARD G. WOODS, and BERNHARDT
FRANK, of counsel,) for plaintiff in error.

JUDAH, WILLARD, WOLF & REICHMANN, (ALEXANDER
F. REICHMANN, JOHN J. HEALY, and HENRY K. URION,
of counsel,) for defendants in error.

Mr. JUSTICE THOMPSON delivered the opinion of the
court:

James C. King, a resident of Chicago, who had accumu-
lated a great fortune in the lumber and commission busi-
ness, died testate November 1, 1905, at the age of about
seventy-five years. July 6, 1901, he executed a will, mak-
ing certain specific bequests to various persons and chari-
ties amounting to the sum of approximately $700,000, and
bequeathing to the Northern Trust Company of Chicago,
as trustee, the residue of his estate, amounting to about
$3,000,000, for the purpose of erecting and maintaining a
home for old men unable to procure homes of their own,

the home to be known as the James C. King Home for Old
Men. By this will he bequeathed to Maude A. Robinson,
of Morrison, Illinois, $10,000 to assist her in acquiring a
musical education. Four days later, in contemplation of his
marriage to her, they entered into an ante-nuptial agree-
ment, by which she agreed to accept in lieu of her rights
and interest in his estate as his widow the sum of $100,000.
The next day they were married, and July 13, 1901, he exe-
cuted a codicil to his will confirming the ante-nuptial agree-
ment and directing the same to be fulfilled and providing
that his will otherwise remain in full force and effect not-
withstanding his marriage. Four days after his death the
will and codicil were taken from his safety deposit box at
the Northern Trust Company in the presence of Byron L.
Smith, president of the trust company, Maude Robinson
King, the widow, Mary C. Melvin, her sister and plaintiff
in error here, and several other parties. The will was read
and it was discovered that no executor was named. Smith
requested the widow to nominate the Northern Trust Com-
pany as administrator, but she refused to do so and with
her sister went to the office of an attorney for advice.
After consultation it was agreed that she should nominate
the Union Trust Company of Chicago as administrator, and
that she should repudiate the ante-nuptial agreement and
renounce under the will and take her widow's share under
the statute. Thereupon she filed in the probate court of
Cook county a petition declaring that she proposed to re-
pudiate the ante-nuptial agreement and to renounce under
the will, and asked that the Union Trust Company of Chi-
cago be appointed as administrator of the estate of James
C. King, deceased, or, upon the production for probate and
due proof of his last will and testament, as administrator
with the will annexed. November 17, 1905, the Union
Trust Company presented the will and codicil of King pur-
porting to have been executed by him in July, 1901, and re-
quested that the same be admitted to record. This petition

alleges that the deceased left him surviving his widow, a brother, a sister, and certain nephews and nieces, as his heirs-at-law. The will, with the codicil, was duly probated and admitted to record December 19, 1905. February 16, 1906, Mrs. King filed a written renunciation of the benefits of the provision made for her by the will and codicil, thereby, except for the ante-nuptial agreement, becoming entitled to dower in the lands of her deceased husband and to one-third of his personal estate. She repudiated the ante-nuptial agreement and negotiations for the settlement of her claim against the estate of her deceased husband were undertaken. It was finally agreed between Byron L. Smith, representing the residuary legatee, and Mrs. King, that she should receive, in addition to the $110,000 bequeathed to her by the will and codicil, $490,000 in cash and the income for life from a trust fund of $400,000. March 12 a bill was filed in the circuit court of Cook county asking for the approval of the settlement. Three weeks later a decree was entered in accordance with the prayer of the bill. March 22, 1907, Mrs. King, having received from the estate the $110,000 bequest and the $490,000 awarded her under the settlement, filed a withdrawal of her renunciation. Up to the time of her death she received regularly the income from the $400,-000 trust fund established by virtue of the agreement. On March 25, 1907, the administrator filed its final report, was discharged and the estate of James C. King closed. In 1911 the James C. King Home for Old Men was completed, and since that time it has been maintained by the corporation organized pursuant to the provisions of the will.

Gaston B. Means, who was employed by Mrs. King as her confidential adviser, testified that about the middle of August, 1915, he discovered in a metal box used for the purpose of preserving private papers of Mrs. King, a will of James C. King dated October 9, 1905. This will was not presented to the Northern Trust Company until some time in July, 1917, and was not filed for probate during

the lifetime of Mrs. King.  She was killed while on a hunting trip in North Carolina on August 29, 1917.  Her will, which was probated, after making several substantial bequests to relatives, named her sister, plaintiff in error, residuary legatee.  Means was charged with the murder of Mrs. King and with the forgery of the "discovered" will.  Means was tried and acquitted of the murder and no formal charge of forgery was filed against him.  The will was seized by the district attorney of New York and was later delivered to the State's attorney in Chicago, who deposited the will with the probate court December 27, 1917.  The witnesses to the 1905 will were Mary C. Melvin, plaintiff in error, Addison S. Melvin, her husband, and Byron L. Smith.  Both Melvin and Smith were dead at the time of the hearing in the probate court in 1918.  March 26, 1918, plaintiff in error filed her petition in the probate court of Cook county to set aside the probate of the will of July, 1901, and to probate the will of 1905 on the ground that the widow, Maude King, was informed that the 1905 will had been destroyed by the testator before his death and that the 1901 will was probated by mistake, because she believed that it was, in fact, his last will and testament.  Before the probate of the 1901 will could be set aside and the 1905 will admitted to probate plaintiff in error had the burden of establishing that the probate of the 1901 will was procured by fraud or mistake (*Conzet* v. *Hibben, 272* Ill. 508,) and that the 1905 will was duly executed.

Florence Lee testified that she met James C. King on one of the streets of Chicago on a Sunday morning in the fall of 1905; that they had been acquainted since she was a little girl; that he knew she had worked as a stenographer; that he asked her if she could copy some confidential matter for him; that she replied that she could, but that she would have to go to some hotel and get the use of the typewriter of some public stenographer; that he requested her address and that she gave it to him; that he left her and

shortly thereafter came to her room with a typewriter; that the typewriter was very dirty and out of repair and the ribbon badly worn; that she cleaned the type as well as she could; that he asked her if she had typewriter paper, and she told him that she did not; that he took from a document-container a document and tore from it the document cover; that she trimmed the torn edge smooth with her scissors and then copied the will in question from some sheets of paper which he gave her; that the type was so worn that some of the letters were very indistinct and that she went over the letters with a lead pencil and made them clear; that the typewriter was so dirty that it soiled the paper in a number of places and that she erased the soiled spots with a gum eraser; that he gave her a twenty-dollar bill, took the typewriter and the document she had copied and the notes he gave her, and left the house.

Mrs. Nellie Dewey testified that she had known Mrs. King since they were girls; that they were raised together in Morrison; that she was employed in a store operated by a man named Gabriel, on Mackinac island, for several summers, and that she frequently met the Kings, who spent the summer season there; that on a Sunday morning early in October, 1905, King came to her house and asked to borrow an old typewriter which Gabriel had left with her; that she loaned him the typewriter; that he returned it to her home late in the afternoon, and when he delivered the typewriter he showed her the unexecuted will; that she went to the King home about three weeks later to collect some money owed by Mrs. King for some coats which she had bought from Gabriel; that Mrs. King gave her the money and at the same time showed her the will which is now in litigation; that the document was the same document which King had shown her when he returned the typewriter and was in the same condition, except that it bore the signature of James C. King and the signatures of Mary C. Melvin, Addison S. Melvin and Byron L. Smith.

Mrs. Melvin testified that she saw King sign the will at his home October 9, 1905; that she and her husband witnessed the will in the presence of the testator and his wife; that Smith signed the will as a witness about two weeks later; that he signed in the presence of the testator and his wife and the other two witnesses; that the will was kept in a bed-room occupied by Mr. and Mrs. King; that she did not see the will from the time it was signed by Byron L. Smith until it was shown to her by Means some time in September, 1915; that the box in which Means said he found the will was in the possession of Mrs. King, or some-one for her, from the time of the death of her husband until she directed it to be delivered to Means; that Mrs. King retained possession of the key to the box all of the time; that she saw her open the box on different occasions to take papers from it or place papers in it. She testified further that she was present when the 1901 will was taken from the safety deposit box and read; that she did not say anything at that time about there being a later will; that Mrs. King was dissatisfied with the provision made for her by the 1901 will and that witness went with her to consult an attorney; that during the conversation with the attorney she did not say to him that she had witnessed a later will which gave to Mrs. King an estate of approximately .$3,000,000; that she never mentioned such a will to the officers of the Union Trust Company during the administration of the 1901 will, and that she never mentioned to any living person, from the time of the death of King until that will was discovered by Means, that she had witnessed such a will. She explains her default in this regard by saying that Mrs. King told her the evening before the visit to the vault of the Northern Trust Company, that Byron L. Smith had told Mrs. King that King had burned the 1905 will the night before he died. While this testimony was competent for the purpose of excusing the silence of plaintiff in error, it was not competent evidence to establish the

destruction of the will or that Smith told Mrs. King that the will was destroyed.

Plaintiff in error had no rights under either of the wills of James C. King, and whatever right she has, if any, to prosecute this litigation is derived from the will of her sister, Maude King. The evidence on behalf of plaintiff in error shows, without contradiction, that Maude King was present when the will of 1905, giving her an estate of approximately $3,000,000, was executed; that she had this will in her exclusive possession two or three days before the death of King; that she had in her possession from the time of King's death until August, 1915, the box in which the will was discovered, and that she had exclusive custody of the key to this box and had actually opened the box on several occasions. There is not a word of competent evidence in the record that she did not know of the existence of this will at the time of the probate of the 1901 will and of her acceptance of the benefits under the 1901 will. The statement of plaintiff in error and of Mrs. Dewey that Maude King told them that Smith told her that the testator had destroyed the 1905 will is hearsay and does not prove anything. The affidavit dictated by Means and executed by Maude King at his instigation, which purports to say that Smith said that the testator had destroyed the 1905 will, is a self-serving declaration and was properly excluded. The evidence also clearly establishes that Maude King grew suspicious of Smith before the death of her husband and did not trust him; that she refused to execute the instrument naming the trust company of which he was president, administrator of her deceased husband's estate, and walked out of his presence and immediately consulted counsel with respect to her rights. It is inconceivable that she would have taken the word of Smith that a will which gave her $3,000,000 worth of property had been destroyed by the testator without making the slightest search for the will or making any protest to her attorney or any other living per-

son regarding it, unless she had decided, for some reason best known to herself, to waive the benefits of the 1905 will. It must be assumed, therefore, that she had the 1905 will in her possession at the time of her husband's death, and that she knew she had it in her possession from that time until the time of her death. It is significant that she took no steps whatever to have the 1905 will probated after Means discovered it. During this period of two years she received the income from the $400,000 trust fund, thereby continuing to recognize the validity of the 1901 will and the settlement made at the time of its probate. As we have said, she participated in the distribution of funds under the 1901 will, thereby recognizing its validity. (*Cunningham* v. *Daugherty,* 220 Ill. 45; *VanSchaack* v. *Leonard,* 164 id. 602; *Gorham* v. *Dodge,* 122 id. 528; *Wilbanks* v. *Wilbanks,* 18 id. 17.) Maude King was a party to the probate of the 1901 will, and if alive she could not set aside the probate of that will without proving that it was obtained by fraud or mistake. (*Conzet* v. *Hibben, supra.*) There is a total failure of proof that the probate of the will of 1901 was procured by fraud or that its probate resulted from mistake. Certainly, plaintiff in error is in no better position than her sister, through whom she claims, and she is conclusively bound by her default. *Foston* v. *Swanson,* 306 Ill. 518; *Robbins* v. *Moore,* 129 id. 30; *Russell* v. *Hubbard,* 59 id. 335; *Cawley* v. *Greenwood,* 192 Mass. 126, 78 N. E. 304.

There are many other serious questions presented by this record, among them whether plaintiff in error has such an interest as entitles her to prosecute this suit, but the conclusion we have reached makes it unnecessary to further extend this opinion by discussing them.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*