Julie Gosman Burnet, as Executrix of the Last Will of Anna Burnet Hardin, Deceased, Appellant, v. First National Bank of Chicago, et al., Appellees.

Gen. No. 46,969.

First District, Third Division.
January 16, 1957.
Rehearing denied February 6, 1957.
Released for publication March 5, 1957.

 ██

Rothschild, Hart, Stevens & Barry, for plaintiff-appellant, Julie Gosman Burnet, as Executrix of the Last Will of Anna Burnet Hardin, deceased.

Johnston, Thompson, Raymond, Mayer & Jenner, Harold J. Clark, and Charles Leviton, all of Chicago, for defendants-appellees; Edward R. Johnston, and Kenneth J. Burns, Jr., of counsel.

PRESIDING JUSTICE FEINBERG delivered the opinion of the court.

Plaintiff, as executrix of the last will of Anna Burnet Hardin, deceased, filed her complaint, as amended, attacking the validity of two inter vivos trusts, which shall for convenience be referred to as trust No. 3639 and trust No. 20673, created by her husband, John H. Hardin. It is alleged that trusts No. 3639 and No. 20673 were created by instruments in writing dated March 11, 1924, and November 1, 1938, respectively. It is further alleged that in creating said trusts, Hardin used and deposited in said trusts the separate property, money and securities belonging to his wife. The complaint prays that an implied trust be impressed upon the property in said two trusts, and the trustees presently in possession be declared trustees for Anna Hardin, her heirs, executors and assigns; that an accounting be had and the present trustees of said trust be compelled to pay over to plaintiff what may be found to be the money and property in their hands belonging to her in her representative capacity; and that judgment be entered for plaintiff for any balance that may be due.

The chancellor heard this cause upon the complaint and answers, testimony adduced in open court, as well as certain stipulations of fact. A decree dismissing

515

the complaint for want of equity was entered, from which decree plaintiff appeals. The record is voluminous, consisting of over 2400 pages and over 250 exhibits.

Plaintiff contends (1) that the two trusts were inter vivos trusts, in which the donor reserved virtually absolute control and the power of revocation; (2) that Mrs. Hardin's separate property was by her authority in writing placed in the custody and control of her husband, and that he was her fiduciary in the management and disposition of her said property; (3) that such of her property as is traceable to the two trusts created by him belongs to her estate, and that the present trustees are in duty bound to account therefor; (4) that at the time of his death, he and his wife were domiciled in California, and under the California statute, upon his death she became vested with a one-half interest in his personal property; and (5) that the trusts, though absolute in form, were merely colorable and illusory, constitute a fraud upon the marital rights of Mrs. Hardin, and cannot be employed to divest her of her statutory marital rights, any more than a will could.

In order to better understand these contentions, we deem it necessary to detail the salient facts, which reveal the background of the donor and his wife, and their relationship with Harry L. Wells and Northwestern University long prior to and at the time of the creation of said trust, which we think have a material bearing upon the donor's intention in creating said trusts.

The relevant facts are virtually undisputed. There appears in the record a series of stipulations of fact, identified as stipulations A, B, C and D, to which we shall make reference.

Trust No. 3639 named the First Trust and Savings Bank of Chicago (later merged with the First National

Bank of Chicago) as trustee. The trust property consisted entirely of insurance policies upon the life of John Hardin. It provided that any proceeds realized from the conversion or expiration of said policies could be invested and reinvested by the trustee. The entire net income from said trust was to be paid to Anna, his wife, during her lifetime, and in the event she predeceased him, upon his death the trust should terminate and be distributed as therein provided. John Hardin reserved to himself the power to revoke, modify or alter, in whole or in part, the said trust instrument. It was stipulated that at no time was any premium upon the policies paid from the trust but was paid by him.

Trust No. 20673 named the First National Bank of Chicago and the donor Hardin co-trustees, and Harry L. Wells as successor trustee to Hardin in the event of his death, resignation or inability to act. A schedule of the securities placed in said trust was attached to the trust agreement.

In this trust agreement, Hardin reserved to himself broad powers of revocation, amendment and removal of the corporate trustee. The net income of the trust was payable to Hardin, the donor, during his lifetime, and upon his death to his wife Anna. Upon her death, the net income was payable to his sister, Gertrude Hardin, during her lifetime, if she survived the donor and his wife. Upon the death of Gertrude, the trustees "shall" divide said trust estate into two equal shares, one share to go to Northwestern University of Evanston, Illinois, and the other half to be divided into two equal portions, designated as Share "A" and Share "B." The income and distribution from said Shares "A" and "B" were to be made in accordance with the provisions therein set forth. The trust property was to be managed by said co-trustees.

Pursuant to the reservation of power to amend, Hardin, the donor, executed several amendments. On

■■■■■■■■■■

October 19, 1939, the donor amended the trust agreement, in which he gave the corporate trustee the right to make any sale or investment of the property comprising the trust, upon the written approval of Conrad Poppenhusen, the donor's attorney, and no sale or investment made upon such approval need require the approval of Hardin, the donor, as co-trustee.

On March 14, 1940, he again amended the trust agreement, by directing the bank to pay to Mrs. Hardin $100 a month out of the net income of said trust, and to credit her checking account at said bank.

On July 13, 1949, he again amended the trust agreement, in which he provided that in the event Mrs. Hardin survives the donor, the trust estate should be divided into two equal shares, designated as "A" and "B," Share "A" to be held in trust as a separate trust for the benefit of Mrs. Hardin, subject to her power of testamentary disposition. In the event of Mrs. Hardin's death without the exercise of the power of appointment and testamentary disposition, then Share "A" should be payable to Northwestern University and Share "B" for the benefit of those named therein. The trustees were to exercise their discretion as between Shares "A" and "B" in such manner as would provide for the "maximum marital deduction under the present Internal Revenue Code."

On October 18, 1949, the donor further amended the trust agreement and therein cancelled the provision in the amendment of July 13, 1949, which gave Anna Hardin the power of appointment and testamentary disposition. This cancellation came after the wife had, by a codicil to her will, disclaimed any intention to exercise the power of appointment.

On November 25, 1951, the donor further amended the trust agreement by making certain specific bequests to be payable to the parties therein named, and providing that the trust "shall," upon his death, pay the net

income from the entire trust to Anna Hardin during her lifetime.

For convenience, we shall refer to John Hardin as the "donor," Anna Hardin as the "wife," and Northwestern University as the "University."

The donor and his wife were married July 8, 1907, and lived together in Evanston, Illinois, until 1909, when they moved into their home in Hubbard Woods, Illinois. The donor on September 18, 1907, purchased and paid $23,159 for two of the three parcels which comprised the Hubbard Woods property, and the title of record was placed in him. On September 30, 1908, he acquired the third parcel of said Hubbard Woods property, with title in his name. There is no evidence in the record that any of Mrs. Hardin's money was used to purchase the three parcels.

Desiring to construct a home upon the Hubbard Woods property, the wife, who was a beneficiary in a trust estate created by her mother, called upon the trustee of that trust to give her $30,000, being the amount necessary for the construction of the home. It appears that under the provisions of her mother's trust, the trustee required that the title of record to the two parcels upon which the home was to be constructed be shown in her name. To accomplish this, title to the two parcels was conveyed to the wife on September 3, 1908. The home was constructed, and the donor and his wife moved in during 1909. The third parcel was conveyed to the wife on January 2, 1926.

On April 20, 1926, the Hubbard Woods property was sold for $200,000, and the entire proceeds were placed in an account of the wife at the First National Bank of Chicago, referred to in the record as agency account No. 3628. This account was established March 7, 1924, and maintained by her until her death. On the day the agency account was created, she executed a written authority, addressed to the bank, to allow the donor "full

519

control of said account and full access to and control over the securities contained therein and any income or proceeds thereof." Out of the proceeds of the sale, $10,178.61 was paid out in connection with the sale. An additional $10,011.11 was withdrawn by the donor to repay his personal loan, and $9,781.35 was credited to Mrs. Hardin's checking account. The remaining $170,028.93 was invested in various securities and deposited in the wife's agency account. In November, 1927, the wife received $24,812.50, realized from the sale of some bonds purchased with the proceeds of the sale of the Hubbard Woods property.

From time to time the donor withdrew securities from said agency account and deposited the same in his personal agency account maintained at the same bank, identified as account No. 5580. The securities in the wife's agency account and the donor's agency account at the First National Bank were placed in said trust No. 20673. Securities were from time to time withdrawn from the latter trust, and other securities and cash substituted therefor.

It was stipulated (stipulation A) that into this trust the donor and his wife jointly conveyed real estate in November, 1938; that in June, 1941, she transferred into the trust 19 shares of the capital stock of the Middle West Corporation, in her name and endorsed by her; that on August 15, 1946, they jointly transferred to this trust a promissory note, a real estate mortgage, as well as a chattel mortgage representing the proceeds of the sale of a summer camp in Wisconsin, which they held in joint tenancy; and that into this trust the donor placed the American Optical Company stock, which the donor had acquired in exchange for his corporate stock in F. A. Hardy and Company, which merged with the American Optical Company. The donor had acquired substantially all of the stock of F. A. Hardy and Company, for which he paid approximately $134,190. It

520

appears that over a period of nine years, beginning in 1911, he received over $300,000 as dividends on the Hardy and Company stock. The merger occurred in 1922. On December 15, 1938, the bank carried the subject property of this trust at a value of $579,327.12, of which $223,621.12 represented the given value of general market stocks and bonds in the trust. The American Optical Company stock value was carried at $281,206. He also placed in the trust the stock in the First National Bank of Chicago. At the time of the death of the donor, the value of the trust property was in excess of $900,000.

The donor and his wife lived together approximately 45 years. He died September 21, 1952, at the age of 86 years, and she died on Janaury 24, 1953, at the age of 82 years. No children were born of the marriage and none adopted. The donor and his wife were then domiciled in the state of California. They lived in a home purchased and paid for by the donor in Pasadena, California, from November 5, 1938, up to the time of their death. The donor left him surviving his wife, his sister, Gertrude Hardin, and two nieces. His wife left her surviving, so far as the record discloses, only the plaintiff, her sister-in-law.

The donor was elected a member of the board of trustees of the University and served from 1917 to 1932, when he became president of the board of trustees, which position he held until July, 1935, and was then elected a life trustee of the University. He was also a director of the First National Bank of Chicago from 1920 until 1934. He always referred to his wife and the University as his two "loves." His relations to the University and its president, as well as the business manager, Harry Wells, were very intimate and confidential. In the planning of his trust estate, he conferred with his attorney, Poppenhusen, as well as with Wells and Williams of the First Na-

521

tional Bank, who was also a trustee of the University. A series of conferences were had, leading to the creation of trust No. 20673, in which the donor made it clear to Poppenhusen and to Wells that his primary desire was to fully protect his wife during her lifetime. She had a life income of $10,000 a year from separate trust estates created by her father and mother, and that, together with the net income she was to receive from trust estate No. 3639 and No. 20673, the donor felt was sufficient to generously provide for her during her lifetime. During his life, he amply provided for her. She was admittedly an intellectual woman, as is obvious from the testimony, and letters appearing in the record, which she had from time to time written concerning her husband's business affairs as well as her own.

The donor, in his last will and testament dated April 29, 1943, after making a specific bequest of $2,000 to a named person, bequeathed the residue of his estate to his wife, in the event she survived him. In a codicil to said will, dated July 9, 1949, he increased the specific bequest from $2,000 to $5,000, and in the codicil made reference to the living trust he had executed, naming the First National Bank of Chicago as trustee. In all other respects his last will and testament was to remain in full force and effect.

The inventory filed in his estate showed a value slightly in excess of $30,000. It appears further that following his death the wife, up to the time of her death, received approximately $14,000 as income from trust No. 20673. She received no income from trust No. 3639 because of the short interval between his death and her death, and no income was received by the trustees from the insurance policies in that trust.

The wife's last will, dated October 28, 1952, after a small bequest to Louise Harwood, bequeathed the resi-

due of the estate to plaintiff, Julia Burnet, her sister-in-law.

It is important to understand the attitude of the wife concerning the trusts created by the donor, her knowledge of what property was involved in the trusts, including her own property, and her willingness that the trusts be devoted to the purposes therein named.

Louise Harwood, a cousin to the wife, called as a witness by plaintiff, testified that she had a conversation with the wife concerning the trust created by the donor, and that she told her "he had gotten his affairs in shape and she was delighted and very much relieved"; and "I am perfectly satisfied with the things he has done for me and I am glad that he is doing it for his sister [Gertrude]."

The deposition of the witness, Mrs. Irish, taken on behalf of the defendants, was offered in evidence by plaintiff. She testified she had known the wife for a period of 26 years. They had a mutual interest in many community activities. She testified that the wife mentioned the fact that "John's property was in trust in Chicago," and "she knew that Northwestern University was to be a beneficiary under John's trust"; that she disclosed a very keen and devoted interest in the University and was proud of his connection with the University.

In October, 1952, the wife wrote to Wells, referring to the memorial bookplate to be placed in the Deering Library of the University for future generations to see, and stated "it gave me a keen appreciation of the thought that John will always be a part of the University he loved," and also "His making you a co-trustee of the trust funds established at the First National Bank in Chicago gives me a great feeling of security." On October 9, 1952, Wells wrote to the wife, "The Trust will be carried out to the best of my abili-

523

ty—having in mind the preservation and enhancement, if possible, of the income which belongs to you."

Robert H. Dunlap, a member of the California bar, who handled the donor's legal business as well as that of the wife, called as a witness for defendants, reluctantly testified because of his relationship to the donor and his wife as attorney, but was directed by the court to testify. He testified that he prepared the amendment to trust No. 20673, dated July 13, 1949, after collaboration with Poppenhusen, being the amendment which gave the wife the power of appointment and testamentary disposition of one-half of the trust, and he presented it to the donor for signature on the day the amendment bore date. There were present the donor and his wife, Kimberly, a brother-in-law of the donor, and the witness's secretary. On that occasion he explained to the donor and his wife the meaning of the amendment and the difference between the original provisions of the trust and the amendment, and that if the amendment remains unchanged, the wife would be entitled to dispose of one-half of the trust in her will in such manner as she sees fit. The wife then said, "I have known about John's plans, the benefits to Northwestern and his nieces, and I don't want him to do anything about it and I wouldn't ever do anything about it," or words to that effect, "I wouldn't even do anything about it if I outlived him."

He further testified that he drew three separate wills for her, one on September 1, 1949, another on August 8, 1951, and the last October 28, 1952. He had drawn a codicil to her will dated September 1, 1949, in which she expressly disclaimed any intention to exercise the power of appointment conferred upon her by the trust amendment. When he drew her second will on August 8, 1951, he reminded her that she was present in July on the date when the amendment was executed, and told her she would have the power of

524

testamentary disposition; that she stated on that occasion, "I know John's plans. . . . he wants to leave half of it to Northwestern, and the other half to his nieces, and I don't want to disturb that arrangement that he planned on so long. He has been a Trustee, and has been Chairman of the Board of Trustees of Northwestern, and he has had it in his mind for a long time to build an administration building for Northwestern."

On each of the occasions when he prepared these wills for the wife, he. reviewed her holdings in cash and securities, and on October 28, 1952, she referred to the assets she had, and asked him, "On the basis of that, how much do I have to leave?" He put down the figures in a rough estimate, and it appeared that she would leave approximately between $50,000 and $60,000, and she said, "Well, I wish there were more than fifty or sixty thousand, because I would like to leave more to the charities, but I can't do it." When the donor died, the wife asked the witness how much she would be getting from the trust, and he told her that she had seen the records every month, the same as he had, and that it would be approximately $35,000 or $36,000 a year income instead of the $100 a month she had been receiving from the trust while the donor was alive. He was certain that the wife knew of the amendment to the trust dated October 18, 1949, which rescinded her power of appointment. A copy of it was found in her home by plaintiff, and plaintiff had told the witness, "I know about the change back to the original form. John has changed it back to original form."

The witness further testified that in all those discussions with the wife, he advised her fully of her rights in the principal of the trust at the First National Bank. It appears that the wife wanted the donor to have everything she possessed, as evidenced by a

525

letter to the donor from her, in which she said, "In the event of my death—you know—my wishes—." After referring to specific items of furniture and jewelry to persons designated in the letter, she concluded her letter with: "For yourself—all—and everything I have. Your devoted wife."

On cross-examination, plaintiff testified that she believed "Mr. Hardin discussed the creation of the trust with Mrs. Hardin at the time he created it, or at least went over the fact that he had created such a trust."

We recognize the principles of law urged by plaintiff respecting the duty of a fiduciary and a breach thereof, and the right to follow the property of the principal when wrongfully appropriated by the fiduciary. These principles of law do not apply to the factual situation in the instant case.

The claim of misappropriation involves chiefly the proceeds of the sale of the Hubbard Woods property over which she had given the donor full power, authority and control. The only investment the record discloses that she made in the Hubbard Woods property was the $30,000 received by her from the trustee of her mother's estate and used for the construction of the home. She received in cash from the proceeds of the sale, as already indicated, $34,593.85, which was more than her investment, and which went into her checking account.

Upon a close analysis of this record, we find that in the instant case the wife had full knowledge of what went into the trust; of his withdrawal of the items from her agency account and placed in the trust; that she directly put into the trust some of her own securities; and that she fully agreed with the plan of disposition provided for in the trust. This is made clear by the undisputed testimony of the witnesses, Dunlap, Harwood, Irish and Williams, as well as her correspondence, to which we have alluded. As already

pointed out, she had stated not only that she agreed with his plan and desire to provide in the trust for the University and his nieces, but that if she outlived him, she would not interfere with it. We are satisfied that were she alive, she would not make the claim here asserted by plaintiff. It should also be remembered that in her letter to the donor, she stated she wanted the donor to have all of her property. In this connection the record does not disclose that after his death there was anyone close enough to her in kinship to whom she cared to will her estate. Apparently she had only plaintiff, her sister-in-law, to select as the object of her bounty.

The form of control which the donor retained over the trust does not make it invalid (Farkas v. Williams, 5 Ill.2d 417; Gurnett v. Mutual Life Ins. Co., 356 Ill. 612, 622) nor per se constitute a mere colorable and illusory trust, and a fraud upon the marital rights of the wife, as contended by plaintiff. Smith v. Northern Trust Co., 322 Ill. App. 168, heavily relied upon by plaintiff, and the cases therein cited are factually distinguishable from the instant case. There, the complaint by the surviving widow charged undue influence, misrepresentation and a scheme on the part of the deceased's son and daughter by a former marriage to defraud the surviving widow of her marital rights, by the creation of the trust executed by the husband. Under the facts present in that case, the court held that the reservation of power and control by the settlor over the trust property constituted a fraud against the rights of the surviving widow, and that the form of trust was merely colorable and illusory.

In the instant case, such charges are not present, and the evidence negatives any intent on the part of the donor to defraud his wife of her marital rights. There is no merit in the claim made by plaintiff that

the donor had any intention to defraud the wife of her marital rights, when it is recalled that he had given her the power of appointment and testamentary disposition of half of the trust. Whether the form of trust employed is merely colorable and illusory, and a fraud upon the marital rights of the spouse, must be determined from the particular facts in each case. In Holmes v. Mims, 1 Ill.2d 274, 279, it was said:

"Furthermore by the greater weight of authority a spouse in one's lifetime may dispose of his or her property—both personal and real, and thus deprive a husband or wife of a possible inheritance, and such deed, transfer or gift is not vulnerable to attack unless the transaction is a sham and is 'colorable' or 'illusory' and is tantamount to fraud."

██ ██ Bearing in mind that the wife, during the life of the donor and after his death, accepted the benefits of the trust, in receiving and retaining the income therefrom, with the knowledge that she possessed concerning the trust, she would, if she were alive and attacked the trust, be estopped from maintaining the instant claim. The plaintiff, as executrix, stands in her shoes. In re Estate of King, 310 Ill. 90, 97. To the same effect is Bogert, Trusts and Trustees, § 173.

In the King case, it was held that the surviving spouse, by accepting the distribution of funds under a will, thereby recognized its validity, and that upon her death, her heir could not attack the validity of the will or its probate, holding further that if the widow were alive, she could not set aside the probate of that will without proving that it was obtained by fraud or mistake.

Similarly, in Remillard v. Remillard, 6 Ill.2d 567, 571, the widow having accepted the benefits of the will, it was held:

"*It is a well settled rule in equity that if any person* shall take any beneficial interest under a will he is thereby held to confirm and ratify every other part of the will, and cannot set up any right or claim of his own which would defeat or in any way prevent the effect and full operation of any part of the will." (Italics ours.)

In applying the doctrine of equitable estoppel against plaintiff, she having no greater right than the wife, we have given consideration to the fact that there has been a material change in the status or position of the principals to the transaction. The death of Poppenhusen and the donor deprives these defendants of their testimony, which would have been available if the wife had, during her lifetime, seasonably presented the claim here made by the executrix.

There is also no merit in plaintiff's contention with respect to trust No. 3639, which is the insurance trust. No property of the wife was part of this trust. The policies on the life of the donor were payable to the trustee, to be distributed in accordance with the provisions of the trust. This trust and trust No. 20673 were created before the donor and his wife became domiciled in California, and since we hold these trusts valid, the California statute, relied upon by plaintiff, would not apply.

The decree of the Circuit Court is fully justified by the record and is affirmed.

Affirmed.

KILEY and LEWE, JJ., concur.