*In re* ESTATE OF FRANK PRUSIS, Deceased.—(GENE BACYS PRUSIS, Petitioner-Appellant, *v.* ALGERD PRUSIS, Respondent-Appellee.)

First District (2nd Division)   No. 81-565

Opinion filed March 30, 1982.

Rima L. Skorubskas, of Zumbakis & Associates, of Chicago, for appellant.

Peter C. Rolewicz and Yasus & Slomka, both of Chicago (Vytold C. Yasus, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

The administrator of the Estate of Frank Prusis, his surviving spouse, Gene Bacys Prusis (Gene), appeals from an order of the circuit court dismissing her amended verified petition for citation to discover assets following an evidentiary hearing by the trial court. The sole issue is whether Gene established a prima facie case.

Decedent Frank Prusis died on July 2, 1978. Gene filed an amended verified petition to recover assets alleging, among other things, that: she and decedent were married November 14, 1970; decedent established a number of "Totten trust" savings accounts in his own name as trustee for his nephew, respondent Algerd W. Prusis (Algerd); decedent retained absolute, unqualified control over the accounts and possessed and exercised all incidents of ownership thereof; petitioner learned how title was held to these accounts only after decedent's death when she saw a list of them furnished by Algerd, attached as Exhibit "A"; decedent and Algerd entered into a written agreement on January 29, 1975, Exhibit "B", purporting to dispose of the proceeds of the accounts upon decedent's death, and into a subsequent, allegedly "superseding" agreement dated December 19, 1977, Exhibit "C", of which petitioner had no notice or knowledge prior to decedent's death; and, the transfer of title to the account was illusory and intended to defraud petitioner. Gene requested that the property either be included in decedent's estate or be found subject to her claim for her statutory marital share.

Algerd filed a verified motion to dismiss the amended petition, which, among other things, admitted the establishment of the Totten trusts, and asserted that: petitioner and decedent wanted to ensure that

their assets would pass to their respective families; petitioner was aware of the manner in which title was held to the subject accounts; petitioner and decedent filed joint income tax returns between 1970 and 1977; petitioner was present during the drafting of the first agreement and participated in designating certain beneficiaries thereof; Algerd had no intent to defraud petitioner, who had, in fact, delivered the list of accounts, Exhibit "A", to Algerd voluntarily.

At the hearing on the petition for citation to recover assets, held October 22, 1980, counsel agreed to proceed on the merits of the petition itself; ruling upon the motion to dismiss was reserved until the completion of petitioner's evidence.

Petitioner testified that decedent had been married once before he married her. Before they married, they discussed the disposition of his property should he predecease her. He would leave everything to her, and nothing to Algerd, who was already wealthy. Gene would leave nothing to decedent because she had children from her first marriage. A few years after the marriage, when Gene asked decedent about "our testament," he replied, "what I said previously still stands." He never told her in what institutions he had deposited his money and hid financial records from her. She saw two passbooks, however, one in her name and the other in respondent's name. Decedent never discussed with her the manner in which title was held in the five subject accounts; she first learned of them after her husband's death.

Petitioner and decedent visited decedent's attorney, Vytold C. Yasus, to complete their income tax returns, but neither decedent nor Yasus ever discussed the disposition of her husband's assets. After January 29, 1975, decedent told her he had made a "testament" in which he listed her grandchildren. She first became aware of the 1975 agreement when she discovered it in a hat box in decedent's closet after his death. She was first informed of the 1977 agreement by Algerd at decedent's wake. On cross-examination she testified that when she and decedent prepared their income tax returns at Yasus' office, decedent brought the "interest slips" from his accounts and she brought hers. She observed and signed the tax return forms to which were attached sheets listing interest from savings accounts. She also observed "bank slips" and later found a carbon copy of the "listings" which decedent had prepared. At decedent's funeral she gave Algerd one or two passbooks bearing Algerd's name "as trustee," apparently not the subject of this suit; two or three bearing decedent's and her names; and two passbooks bearing decedent's name. She told Algerd she did not know where the others were kept and he replied "with me."

Petitioner testified on redirect examination that she never exchanged "bank slips" with the decedent, and never saw a list on which the name of

the bank, as well as the manner in which title was held, was listed. Decedent never showed her the passbooks before his death.

Algerd was called by petitioner as an adverse witness (Ill. Rev. Stat. 1979, ch. 110, par. 60). He was decedent's nephew. He did not know when the five accounts in question had been established, except that one had been established prior to decedent's marriage to petitioner. The "Bell Savings" account dated back to September 1969, which account he referred to as the "one that has my name on it." He identified an account at "First Federal" bearing an issue date of December 1973, which was a transfer from another account; an account at "Union Federal", which was also transferred from another account in 1971; and another account at "Union Federal Savings and Loan" which was opened in October 1975 and which had been transferred from another account. All the accounts in question had been established prior to September 16, 1977.

Algerd testified that decedent periodically gave him small gifts, telling him, " 'I got a dividend and here's your share' "; however, "[i]t never was anywhere equal. But you know $50 or something close to my birthday or whatever." Prior to decedent's death he did not discuss with Gene any of the accounts or agreements in question, but he did so afterwards when "she brought it out. She knew all about it." Gene asked him to verify whether he had two agreements with decedent; when he so acknowledged, Gene looked at the agreements and simply shook her head. The total amounts in the five accounts at or near the date of decedent's death approximated $57,000.

No passbooks were offered or received in evidence, nor were any underlying financial institution trust agreements which established the accounts.

Counsel for Algerd renewed his motion to dismiss the amended petition. Memoranda of law were filed by the parties. After oral argument thereon, the trial court granted Algerd's motion and dismissed Gene's amended petition.

Gene argues that Totten savings account trusts, as well as other *inter vivos* transfers, which are colorable or illusory, are invalid as to the rights of a surviving spouse, relying principally upon *Montgomery v. Michaels* (1973), 54 Ill. 2d 532, 301 N.E.2d 465 (*Montgomery*), and *In re Estate of Mertes* (1975), 34 Ill. App. 3d 557, 340 N.E.2d 25 (*Mertes*). In *Montgomery*, the supreme court held that a Totten trust, while valid for other purposes, cannot defeat the surviving spouse's statutory share, wherein the settlor is trustee and retains absolute, unqualified control over the account and exercises the incidents of ownership thereof, including the right to receive interest payable thereon and withdraw principal therefrom. The supreme court emphasized that the intent of the deceased

spouse in creating the trust, even if to deprive the surviving spouse of his or her statutory share, is irrelevant to this determination and the trust corpus would be available to satisfy the spouse's statutory share, or for the payment of estate debts and the expenses of administration. The *Mertes* court followed *Montgomery* and gave that decision retroactive effect by applying it to Totten trusts established before *Montgomery*. The appellate court found the Totten trusts there at issue invalid as to the surviving spouse, notwithstanding the trial court's finding that the trust was neither illusory nor fraudulent, and that there was no secretive conduct involved in its establishment or maintenance. On the basis of these authorities, Gene urges that the trusts here should be declared invalid as to her rights.

In *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 383 N.E.2d 185, relied upon by both parties, plaintiffs, in a consolidated appeal, attempted to invalidate certain *inter vivos* transfers. Plaintiffs in each case were the surviving husbands and raised *Montgomery* in support of their claims. In the first case, decedent had created an *inter vivos* trust for the ultimate benefit of several relatives and charities. In the second case, a savings account named decedent and her sister-in-law as joint tenants. In distinguishing *Montgomery*, the supreme court stated (73 Ill. 2d 342, 356-57):

> "The courts of this State have readily upheld *inter vivos* trust arrangements where the settlor has named himself trustee and retained indicia of ownership and control. (*Farkas v. Williams* (1955), 5 Ill. 2d 417.) There is no contention in this case that the trust was not a valid *inter vivos* trust. It is only contended that it is invalid to the extent that it deprived the plaintiff of his marital rights in the property. With the exception of *Montgomery v. Michaels* and the rules therein concerning the validity of Totten trusts, no general principles have emerged invalidating such other *inter vivos* transfers *per se* in respect to the marital rights of surviving spouses. Rather, whether the transfer of property in trust is vulnerable to attack depends on whether the trust employed is colorable and illusory and a fraud on marital rights. (*E.g., Holmes v. Mims* (1953), 1 Ill. 2d 274.) This determination necessarily turns on the facts of each individual case. (See *Burnet v. First National Bank* (1957), 12 Ill. App. 2d 514.) We therefore reject the reasoning of the appellate court that our decision in *Montgomery* is controlling in this case."

Gene reads *Johnson* as merely limiting *Montgomery* to Totten trust accounts, which she maintains the instant trust accounts must be. The thrust of Algerd's argument is that the accounts at issue are not Totten trusts; therefore, their validity must be ascertained with reference to principles relating to revocable *inter vivos* trusts under *Johnson* rather

than those relating to Totten trusts set forth in *Montgomery*. Algerd also cites and relies upon *In re Estate of Anderson* (1966), 69 Ill. App. 2d 352, 217 N.E.2d 444 (*Anderson*), and *In re Estate of Chandler* (1980), 90 Ill. App. 3d 674, 413 N.E.2d 486 (*Chandler*).

In *Anderson*, the court held that two savings account trusts were revocable *inter vivos* trusts, not Totten trusts. The court observed that the account at issue in *In re Totten* (1904), 179 N.Y. 112, 71 N.E. 748, consisted merely of "a savings account in the name of a depositor as trustee for another, nothing more." (69 Ill. App. 2d 352, 363.) In contrast, accounts at issue in *Anderson* were accompanied by specific trust instruments "containing definite terms and provisions regarding the deposit and disposition of funds and the change, alteration, modification and termination of the trust." (69 Ill. App. 2d 352, 363.) In *Chandler*, a surviving spouse claimed that a savings account trust established by her deceased spouse for his brother was subject to her statutory marital share. Her name had been stricken from the trust account by decedent and the name of his brother was substituted therefor. The trial court held the transfer to have been illusory under *Montgomery* and ordered, among other things, one-half to the wife as marital property. The account was accompanied by a "Discretionary Revocable Trust Agreement" containing definite trust provisions, as in *Anderson*, and was held by the appellate court to be an *inter vivos* transfer outside the scope of *Montgomery*. The appellate court examined the facts surrounding the creation and maintenance of the trust, *e.g.*, decedent was in poor health, had lived with the beneficiary, and had made no withdrawals from the trust *res*, and found that decedent had intended to make a valid and effective transfer of the funds to his brother.

■■ Gene contends that Algerd is bound by a judicial admission, made in his motion to dismiss, that the instant savings accounts were Totten trusts; however, such motions are made only for the purpose of determining whether, as a matter of law, the facts set forth in a petition or complaint state a claim upon which relief may be granted. (*O'Fallon Development Co. v. Ring* (1967), 37 Ill. 2d 84, 88, 224 N.E.2d 782; *Cross v. Chicago Housing Authority* (1979), 74 Ill. App. 3d 921, 929, 393 N.E.2d 580, *aff'd* (1980), 82 Ill. 2d 313.) Accordingly, we must examine the agreements of January 29, 1975, Exhibit "B", and December 19, 1977, Exhibit "C", for the purpose of ascertaining whether either or both contains "definite terms and provisions regarding the deposit and disposition of funds and the change, alteration, modification and termination of the trust[s]," relied upon in *Anderson*, or rise to the dignity of "Discretionary Revocable Trust Agreement[s]," found in *Chandler*. The agreements contain identical headings, to wit, "Agreement." They also contain identical opening and closing language, as follows:

"This Agreement executed the day below written acknowledges

that FRANK PRUSIS has established several savings accounts in his name as trustee for ALGERD W. PRUSIS. In consideration therefor, the said ALGERD W. PRUSIS agrees to disburse from the aforesaid accounts upon the death of FRANK PRUSIS the following amounts:

◦ ◦ ◦

All the remainder of such funds shall be retained by ALGERD W. PRUSIS for his personal use. In the event any of the above named persons are minors at the time of my death, I direct that ALGERD W. PRUSIS hold the amounts as trustee for such minors until they shall attain the age of majority."

Both agreements are dated as above noted and witnessed by one witness, Vytold C. Yasus. Both are signed by decedent and Algerd. The ellipsis shown above contain in each agreement the names of persons to whom funds in specific amounts are to be distributed, as well as provisions in specific amounts for decedent's burial, post-funeral luncheon, and grave maintenance. The only differences between the 1975 and 1977 agreements are the inclusion of Gene and her grandchildren in the former and their exclusion from the latter agreement.

■■ To be noted is the absence of any language in the 1977 agreement stating that it supersedes the 1975 agreement. No declaration of trust for Algerd is set forth in either agreement; merely language that decedent has elsewhere established "several savings accounts in his name as trustee for ALGERD W. PRUSIS." Although Algerd is named trustee of such amounts as may be due minors at the time of decedent's death until they reach the age of majority, neither the specific trust accounts nor their amounts are identified in either agreement. Nor is any mention made in either of revocability, change, alteration or modification of the trusts. From the foregoing, the agreements cannot be said in and of themselves to constitute trust agreements conveying *inter vivos* interests which satisfy the requirements of *Anderson* and *Chandler* and remove them from the ambit of Totten trusts described in *Montgomery* and *Mertes*.

Each of the trust accounts said to have been established by decedent appears to have been created in savings and loan institutions, namely, First Federal Savings and Loan Association, Union Federal Savings and Loan Association and Bell Federal Savings and Loan Association and, if so, may be governed by section 4—10(b) of the Illinois Savings and Loan Act (Ill. Rev. Stat. 1975, 1977, ch. 32, par. 770(b)). Those provisions contemplate the execution of written trust agreements with the institution and encompass designation and change of beneficiaries and trustees, revocation, and other amendments and changes, among other provisions. Neither the passbooks nor the underlying agreements creating them have been submitted or received in evidence. In their absence, it is impossible

to determine whether the putative trust accounts are revocable *inter vivos* trusts or Totten trusts.

Accordingly, the cause must be reversed and remanded. Algerd should be directed to answer the amended petition and, upon further hearing, the trial court should consider any trust agreements under which the savings accounts were created (*In re Estate of Anderson*), or any agreements which may appear in the passbooks themselves in the event no separate agreement was made, together with any facts from which inferences may be drawn as to decedent's intent or lack thereof to make valid *inter vivos* transfers. *Johnson v. La Grange State Bank*; *In re Estate of Chandler*.

Reversed and remanded.

STAMOS, P. J., and PERLIN, J., concur.